CITY OF WICHITA v. OLD COLONY TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit.    September 5, 1904.)

No. 2,002.

**1. TELEPHONE COMPANIES—CONVEYANCE OF PROPERTY—FRANCHISE.**

A conveyance by a telephone company to another company of all its lines, poles, wires, switch boards, and appurtenances in a city carries with it by necessary implication the franchise from the city under which the system is being operated, although it is not expressly mentioned.

**2. SAME—FRANCHISE—REPEAL BY SUBSEQUENT ORDINANCE.**

An ordinance granting a franchise to a telephone company, which, under the law of the state, continued for 20 years, was not repealed by a subsequent ordinance granting certain rights enumerated to a successor of such company, and imposing upon it certain duties, which ordinance was accepted by it, and by its terms was to continue in force for five years, and until terminated by notice, although such ordinance enumerated substantially the same rights granted to its predecessor and contained a general repealing clause.    Van Devanter, Circuit Judge, dissenting.

**3. SAME—TERMINATION OF FRANCHISE—EXECUTION OF POWER RESERVED.**

An ordinance granting to a telephone company the right to maintain and extend its lines in the streets of a city, which franchise, under the law of the state, would continue for twenty years unless sooner terminated in accordance with its terms, provided that the rights granted "shall be for the period of five years, and until terminated by the resolution of the mayor and councilmen * * * upon six months' notice to be served on the managing agent of said company," which notice might be served at any time after six months immediately preceding the expiration of five years.    *Held*, that such franchise was not terminated by a motion adopted by the council six months before the expiration of the five years, directing the clerk to notify the company "when their present franchise would expire," and that the city would require them to remove their wires and poles at that time, and the service of a notice by the clerk reciting the adoption of the motion, and in which he fixed the time for the expiration of the franchise, without any further action to that end having been taken by the mayor and council.

**4. SAME—STATUTORY RIGHT TO USE OF STREET—POWER OF CITIES.**

By a statute of Kansas enacted in 1868 (Gen. St. 1868, c. 23, art. 8, § 74) it was provided that "corporations created for the purpose of constructing and maintaining magnetic telegraph lines are authorized to set their poles, wires, and other fixtures along and across any of the public roads, streets, and waters of this state in such manner as not to incommode the public in the use of such roads, streets and waters."    In 1881 (Laws 1881, p. 84, c. 37, § 11, subd. 22) a general statute was enacted providing for the organization of cities of the first class, and vesting the mayor and council with power, among other things, "to grant the right of way for the erection of telegraph or telephone posts and wires along and upon any of the streets, alleys, or ways of the city, and change, modify, and regulate the same."    In 1885 (Laws 1885, p. 151, c. 104, § 2) an act was passed authorizing the formation of telephone companies, and granting to such companies all the rights and powers conferred by the general laws of the state on telegraph companies.    *Held*, that the telegraph statute was not, by implication, repealed as to cities by the act for the incorporation of cities, but that the right given thereby to cities with respect to telegraph or telephone poles was confined to the exercise of the police power by way of regulation, and that a city was not thereby given power to compel

¶ 4. Rights of telegraph and telephone companies to use of streets, see note to Southern Bell Tel. & Tel. Co. v. City of Richmond, 44 C. C. A. 155.

a telephone company to remove its poles and wires from the streets, where they had been built and maintained for many years, no claim being made that they interfered with the use of the streets by the public. Van Devanter, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Kansas.

For opinion below, see 123 Fed. 762.

A. E. Helm and Earl Blake (S. S. Ashbaugh and David Smyth, on the brief), for appellant.

R. R. Vermilion and Edward P. Gates (C. V. Ferguson, Rozzelle, Vineyard & Thacher, Lucien Baker, and Robert P. Clapp, on the brief), for appellees.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. The Missouri & Kansas Telephone Company is now, and has been for nearly 20 years, the owner of a telephone system in the city of Wichita, which not only serves the purpose of a local exchange, but is at the same time part of an extensive system of long distance telephones reaching from St. Louis, Mo., to the western part of the state of Kansas. The complainants below (appellees here), the Old Colony Trust Company and Charles J. Hubbard, are trustees under a mortgage executed by the telephone company upon all its property to secure the payment of $1,250,000 of its bonds. In 1902 the mayor and council of the city, claiming that the right of the telephone company to occupy its streets and alleys had terminated, adopted a resolution, which, after reciting among other things "that the said Missouri & Kansas Telephone Company have now no right or authority to maintain and operate its wires, poles, cables, and electrical appliances along, in, over, through, under, or across the public streets, alleys, and public grounds of said city," required the company to remove its telephone system from the city on or before the 1st day of September, 1902, and in case of its failure so to do the chief of police, fire marshal, and city electrician were directed to remove the same. In furtherance of the same purpose, an ordinance was passed making it a criminal offense for any person, firm, or corporation to set any poles or string any wires in the streets, alleys, or public places of the city, or maintain the same therein, without first having obtained the consent of the city therefor. Under this ordinance the employees and officers of the telephone company were arrested and fined, and the poles set for the repair and extension of its system were cut down and removed. Believing that the city authorities were about to carry the above resolution into effect, the complainants filed their bill herein on the 23d day of August, 1902, reciting the above facts and other facts upon which the telephone company based its right to maintain and extend its system. Issue was joined and testimony taken. At the final hearing a permanent injunction was granted, which, in substance, restrained the city from destroying the telephone system as established and from interfering with the telephone company in repairing and extending the same. Against that decree the city brings the present appeal.

The telephone company bases its right to maintain and extend its system upon three grounds: (1) Ordinance of the city of Wichita No. 391; (2) Ordinance No. 1,356; (3) a general statute of the state of Kansas. The case can best be considered in connection with these several claims.

Ordinance No. 391 was passed in November, 1886. It grants to the United Telephone Company, its successors and assigns, the right to erect and maintain posts, poles, and other fixtures necessary in carrying electric wires in, along, across, and under the streets and alleys of said city. No term being expressly fixed, it is limited by general statute of the state to twenty years. At the time this ordinance was passed the United Telephone Company was the owner of the local exchange in the city of Wichita. On the 25th of February, 1887, by deed dated on that day, this company conveyed to the Missouri & Kansas Telephone Company all its telephone lines as then located, and also the poles, wires, magnetic bells, and switch boards of said company, in said city, together with all the appurtenances thereunto belonging or in anywise appertaining. The franchise is not expressly mentioned in the deed. For this reason the city contends that it did not pass. The grant should be interpreted so as to give effect to the intention of the parties. After the conveyance of the property, the right created by the ordinance was of little value to the grantor, and the property without the right would have likewise been of little value to the grantee. It would be a violent construction to hold that the grantor intended simply to convey the tangible property without at the same time transferring the right which alone would make the property of any use. If, notwithstanding its deed, the United Telephone Company were here asserting ownership of the franchise, its contention could not be sustained; much less can a third party assert such a claim. The conveyance by a railroad company of its road, roadbed, and appurtenances has been held to convey the franchise to operate the same by a necessary implication. Coe v. Columbus R. R. Co., 10 Ohio St. 372, 75 Am. Dec. 518.

It is also contended by the city that Ordinance No. 391 was repealed by Ordinances Nos. 538 and 1,356. The first of these was passed in 1888. It was properly terminated at the expiration of five years, and was then succeeded by Ordinance No. 1,356. They are the same in terms, and were passed for and accepted in writing by the Missouri & Kansas Telephone Company. Each contains a general repealing clause. They impose upon the company many duties and grant to it certain rights, and among them the same rights, in substance, as are granted by Ordinance No. 391. Did they repeal that ordinance? If the United Telephone Company had continued to be the owner of the franchise granted by Ordinance 391 at the time the subsequent ordinances were passed, it could not be reasonably contended that the latter repealed the former. But by no principle of construction can the transfer of the franchise give to the subsequent ordinances any greater force by way of repeal than they would have possessed if no transfer had been made. Whether one ordinance repeals another must depend upon their terms, and not upon the ownership of the rights which they create.

Section 4 of the two ordinances in favor of the Missouri & Kansas Telephone Company, above referred to, reads as follows:

"The rights and privileges hereby granted to the said company shall be for the period of five years and until terminated by the resolution of the mayor and council of the city of Wichita upon six months' notice to be served upon the managing agent of said company at Wichita, said notice to be served at any time after six months immediately preceding the expiration of five years from the acceptance of the provisions of this ordinance by said company."

As the rights granted by these ordinances may be terminated in five years, while those granted by Ordinance 391 run for twenty years, it is further urged by the city that the telephone company waived any rights which it held under the latter ordinance by accepting the former. This contention is also untenable. It is "the rights and privileges hereby granted" which the city has authority to terminate under section 4. It has no power under that section to terminate any other rights or privileges. The company accepted these ordinances conferring upon it certain benefits and subjecting it to certain obligations upon the condition that the rights and privileges conferred might be terminated at the expiration of five years. From this it by no means follows that the company by implication waived rights which it acquired from another corporation, and for which it paid a large consideration. For the foregoing reasons we hold that the telephone company is the owner of the right granted by Ordinance 391, which by statute will not expire until November, 1906.

The provisions of Ordinance 1,356 have already been explained. It was passed March 23, 1896, and accepted by the company in writing April 1st of the same year. Appellant concedes that it confers upon the Missouri & Kansas Telephone Company the right to maintain and extend its system in the city for the term of twenty years, unless sooner terminated by the mayor and common council pursuant to section 4, which is quoted above in full. The only question in respect to this ordinance is, have the rights of the telephone company under it been terminated? The record of a meeting of the council held on the 24th of September, 1900, contains the following entry:

"On motion of Councilman Burton clerk was instructed to notify the Missouri, Kansas Telephone Company when their present franchise would expire, and that the city would require them to remove their wires and poles from the streets at that time."

On September 28, 1900, and again on October 13th of the same year, the city clerk served notice upon the telephone company that he had been instructed by the city council to officially notify it that its franchise would expire April 1, 1901. A copy of the motion of Councilman Burton was inserted in the notice. The foregoing is the only action attempted by the city to terminate the rights of the company under the provisions of Ordinance 1,356. Can it be given that effect? An examination of section 4 will show that the discretion which it vests for the termination of the rights and privileges created by the ordinance is reposed in the mayor and council. They are required to exercise that discretion by a resolution. They could terminate those rights and privileges at the expiration of five years, or at any time thereafter within the period of the grant, namely, twenty years. It was for them to fix

the time. This they failed entirely to do. The defect is not a lack of record, as urged by counsel for appellant, but a want of action. No evidence was offered to show that the entry does not truthfully state what was done. To terminate is to fix the term; in this case to specify the date at which the right shall cease. The motion simply directs the clerk to notify the company "when their present franchise would expire." No time is specified. That is left to the clerk. It may be that the members of the city council had it in mind to terminate the rights at the expiration of five years, but there is nothing in the motion which so declares. The private but unexpressed intention of the members of the city council cannot be given effect to destroy the important rights created by this ordinance. The ordinance itself requires an outward act which shall clearly convey such an intention. Under the motion that was carried the clerk might as well have given notice that the rights of the telephone company would end on the 1st of April, 1902, as on the 1st of April, 1901. There was nothing in the motion itself, nor in the motion when read in connection with the ordinance, which fixed the date. The action of the council was therefore ineffectual to terminate the rights of the company under this ordinance, and those rights are still in full force.

Appellees also contend that they are entitled to occupy the streets and alleys of the city under a general statute of the state. To understand the issue on this branch of the case, it will be necessary to set forth the several laws upon which the parties respectively base their contentions. In 1868 (Gen. St. 1868, c. 23) the Legislature of Kansas passed a statute dealing with the subject of corporations for the construction and maintenance of telegraph lines, which contains this provision:

"Corporations created for the purpose of constructing and maintaining magnetic telegraph lines are authorized to set their poles, wires and other fixtures along and across any of the public roads, streets and waters of this state in such manner as not to incommode the public in the use of such roads, streets and waters."

In 1881 (Laws 1881, p. 84, c. 37, § 11, subd. 22) a general statute was enacted providing for the organization of cities of the first class. Among other things, it vested in the mayor and council power—

"To grant the right of way for the erection of telegraph or telephone posts and wires along and upon any of the streets, alleys or ways of the city, and change, modify and regulate the same."

In 1885 (Laws 1885, p. 151, c. 104, § 2) an act was passed authorizing the formation of telephone companies. It defined their powers as follows:

"All such corporations shall have all the rights and powers conferred, and be subject to all the liabilities and duties imposed by the general laws of this state upon telegraph corporations."

It is manifest from the language of these statutes that, if the telegraph statute was in full force at the time the statute for the formation of telephone companies was enacted, then the latter companies have the right to place their posts and wires in the public streets of the defendant. It is contended, however, by the city that the provi-

sion of the act for the incorporation of cities of the first class above quoted repealed that portion of the telegraph statute conferring authority to set poles in "streets," and that the right created by that act was, after the passage of the municipal charter act, confined to country highways. Controversies almost identical in character have been frequently before the courts, and the decisions have been uniformly opposed to defendant's contention here. A statute of Wisconsin authorized the formation of corporations for the purpose of building and operating telegraph lines, empowering them to construct and maintain such lines upon, along, or across any public road or highway. A law, subsequently passed, under which the city of Oshkosh was incorporated, granted to the mayor and council authority to "regulate, control and prohibit the location, laying, use and management of telegraph, telephone, and electric light and power wires and poles in the public streets and alleys." Acting under the power which they claimed to possess by this charter, the municipality undertook to compel the Wisconsin Telephone Company to remove its poles and wires from the city. In sustaining the rights of the company under the state statute, notwithstanding the power given by the charter to "prohibit" their exercise, the Supreme Court of Wisconsin uses the following language:

"Undoubtedly the common council had authority, and it was its duty, by ordinances, resolutions, or by-laws, to control and regulate the streets, alleys, and public grounds of the city, and to remove and abate whatever might be fairly regarded as an obstruction or encroachment thereon. Subsection 30, § 3; subc. 6, c. 183, p. 709, Laws 1883. The same section declares that the common council shall have like authority 'to regulate, control and prohibit the location, laying, use and management of telegraph, telephone and electric light and power wires and poles.' But we do not think this was designed as giving to the municipalities absolute authority to remove such poles and wires entirely from the city, nor to exclude such companies altogether from carrying on or operating their business within the corporate limits of the city, but simply to regulate the same, and to prohibit such location in improper places. Otherwise the municipalities of the state would have the power to nullify what the legislature had expressly authorized." Wis. Tel. Co. v. Oshkosh, 62 Wis. 32, 21 N. W. 828.

A statute of the state of Michigan, passed in 1883, providing for telephonic and messenger service corporations, contained this provision:

"Every such corporation shall have power to construct and maintain lines of wire for use in the transmission of telephonic messages along, over, across or under public places, streets, highways," etc.

The municipal corporation act of the same state, passed in 1895, grants to the city council "authority to regulate or prohibit the use or placing of telegraph, telephone or light poles in or over the streets." The Supreme Court of the State of Michigan, in Michigan Telephone Company v. City of Benton Harbor, 80 N. W. 386, held that the latter statute did not repeal the former, nor vest municipalities with power to take away the right therein granted to telephone companies. On the contrary, it was decided that the word "prohibit" must be construed as simply granting authority to make proper regulations to preserve to the public the use of the streets as common highways of travel. Speaking to this point, the court says:

"It is, however, insisted that Act No. 215, p. 441, Pub. Acts 1895, under which the defendant was incorporated, repeals the telephone act in so far as

it may be held to authorize the use of highways and streets for the erection of poles without the consent of the municipality."

And after quoting the above provision of the charter act, the court proceeds:

"The title of this chapter [chapter 22] is 'Streets and Public Grounds,' and the above language is found near the middle of the section, which specifies various subjects upon which the council may legislate. Repeals by implication are not favored. To this proposition it is unnecessary to cite authorities. The intent to repeal must very clearly appear, and courts will not hold to a repeal if they can find reasonable ground to hold the contrary. Merrill v. President, etc., 35 Mich. 24; Conners v. Iron Co., 54 Mich. 168, 19 N. W. 938. This case forcibly illustrates the danger of holding general laws repealed by implication in granting charters to municipal corporations. Did the Legislature intend by the above law for the organization of cities to confer upon those municipalities the power to annul the law in regard to telegraph and telephone companies, and to entirely prohibit the use of the telegraph and telephone, which have become essential in commercial transactions. Clearly, such an intention should not be attributed to the Legislature unless the language of the law leads to no other conclusion. We see no difficulty in giving effect to both laws by holding that the latter act confers this authority upon municipalities, subject to the general laws of the state in regard to the use of its streets and highways for telegraph and telephone purposes. These municipalities may, under this law, prohibit the erection of these poles in places and in a manner which will injure or incommode the public. This was the view taken by the Supreme Court of Wisconsin under a similar decision. Telephone Co. v. City of Oshkosh, 62 Wis. 32, 21 N. W. 828."

In 1860 the Legislature of the state of Minnesota passed a law granting to telegraph companies "the power and right to use the public roads and highways of this state for the purpose of erecting posts or poles on or along the same to sustain the wires or other fixtures." Laws 1860, p. 106, c. 12. In 1881 this statute was so amended as to include telephone companies. Laws 1881, p. 84, c. 73. The charter of the city of Minneapolis, subsequently passed, granted the following authority to the council:

"To regulate and control or prohibit the placing of poles and the suspending of electric or other wires along or across the streets of said city and to require any or all already placed or suspended either in limited districts or throughout the entire city to be removed or to be placed in such manner as it may designate beneath the surface of the street or sidewalk."

The Supreme Court of Minnesota, in the case of Northwestern Telephone Exchange Company v. City of Minneapolis, 86 N. W. 69, held that a fair construction of both these statutes confined the city to a reasonable exercise of its police powers.

The statutes referred to in these decisions from Wisconsin, Michigan, and Minnesota present quite as strong a conflict as exists between the telephone statute of Kansas and the act providing for the incorporation of cities of the first class. In the one case by the letter of the statute the mayor and common council of cities are vested with authority to prohibit the exercise of a right granted by the Legislature of the state. In the other case the municipal authorities are authorized to grant, and by implication to refuse, a right of way already granted by state statute. Surely there is as strong a conflict between the grant of power upon the one hand and the right to prohibit its exercise upon the other as there is between the issuance of the same right from two

authorities, the one superior and the other inferior. The power to prohibit is as incompatible with the existence of a right as the power to grant the same right. We therefore find less difficulty in disposing of the present case upon the same grounds as guided the courts in the cases above cited than was presented to them by the statutes which they had under consideration. The cardinal rule is that repeals by implication are not favored. Such a construction is adopted only when no other reasonable construction can be found. "The implication of a legislative intent to repeal," says the Supreme Court of Kansas in Stephens v. Ballou, 27 Kan. 594, "must be such as to satisfy the mind beyond a reasonable doubt." See, also, Keirsey v. Labette Co., 30 Kan. 576, 2 Pac. 864; Hornady v. State, 63 Kan. 499, 65 Pac. 656; Wood v. United States, 16 Pet. 342, 10 L. Ed. 987; Red Rock v. Henry, 106 U. S. 596, 1 Sup. Ct. 434, 27 L. Ed. 251; Frost v. Wenie, 157 U. S. 46, 58, 15 Sup. Ct. 532, 39 L. Ed. 614. The same rule has been declared and enforced by this court in Stryker v. Board of Commissioners, 77 Fed. 582, 23 C. C. A. 286, and Board of Commissioners v. Ætna Life Ins. Co., 90 Fed. 222, 32 C. C. A. 585, cases in which the inconsistency between the statutes under consideration was quite as great as in the present case. We believe that the legislative purpose is given effect when the right granted by the general statute is preserved on the one hand and the full exercise of the police power by way of regulation is upheld on the other. Such has been the uniform holding of the courts. Am. Union Tel. Co. v. Town of Harrison, 31 N. J. Eq. 627; Township of Summit v. N. Y. & N. J. Tel. Co., 57 N. J. Eq. 123, 41 Atl. 146; Rochester v. Bell Telephone Co. (Sup.) 64 N. Y. Supp. 804; Zanesville v. Telegraph & Telephone Co., 64 Ohio St. 67, 59 N. E. 781, 52 L. R. A. 150, 83 Am. St. Rep. 725; Abbott v. City of Duluth (C. C.) 104 Fed. 833. The only decisions that are in apparent conflict are State v. City of Spokane (Wash.) 63 Pac. 1116, and Southern Bell Telephone Co. v. City of Richmond, 103 Fed. 31, 44 C. C. A. 147. Here the conflict, however, is only apparent, for in both these cases the state statute which granted the right to the telephone company contained a provision that it could only be exercised by the consent of the local authorities.

The action of the Legislature of Kansas furnishes strong reason for belief that it did not intend to repeal the act of 1868 in relation to telegraph corporations by the statute providing for the organization and government of cities of the first class. There have been two general revisions of the statutes of that state since the latter act was passed— one in 1889, the other in 1899. In both of these revisions the two statutes under consideration are carried forward without change. If it had been the intention of the Legislature by the act for the incorporation of cities to repeal the former statute in so far as the same relates to cities, there would have been some change in the language to indicate this change of purpose. The word "streets" would at least have been stricken out of the former law in these revisions. No such change, however, has been made, and this affords a strong inference that no purpose existed in the mind of the legislature to repeal any part of the statute of 1868.

Again, it should be remembered that the act of 1868 relates exclusively to telegraph corporations. The municipal charter act vests in the mayor and council power to grant the right of way to such corporations as well as to other companies mentioned in the section. It is, however, a matter of common knowledge that in 1866 Congress passed a statute which grants to telegraph companies the right to set their poles and stretch their wires along all post roads, and that all letter carrier routes established in any city or town for the collection and delivery of mail matter constitute post roads. The record in this case is silent upon the subject, but it is altogether probable that in cities of the first class in the state of Kansas free mail delivery systems were in force at the time the municipal charter act was passed in 1881, and that such routes have been in existence in those cities down to the present time. A great body of litigation in the federal courts as well as in the state courts informs us that all the telegraph companies of the country promptly accepted the provisions of the act of July 24, 1866 (14 Stat. 221, c. 230). See, for example, as to the Western Union Company, Pensacola Tel. Co. v. W. U. Tel. Co., 96 U. S. 1, 24 L. Ed. 708; and as to the Postal Company, Postal Tel. Co. v. Alabama, 155 U. S. 485, 15 Sup. Ct. 192, 39 L. Ed. 231. It is therefore manifest that telegraph companies have at all times since the passage of the municipal charter act in Kansas been entitled, under this federal statute, to occupy the streets of cities of the first class in that state. Their "right of way" there has not been dependent upon municipal consent. Notwithstanding this fact of common knowledge, the Legislature of the state of Kansas has kept in force the statute which, it is urged by the defendant, vests municipal authorities with power to grant and impliedly to refuse to grant such right of way. This statute cannot be construed as we are thus asked to construe it, without rendering it void. If we adopt the construction that it is intended simply to vest in the local authorities police power over the subject, the act then becomes harmonious not only with the other statutes of Kansas, but with this federal enactment. We ought not to entertain the view that the legislature of Kansas has kept this statute in force during all these years with respect to telegraph companies, intending thereby to confer upon municipalities power which would be directly in conflict with federal law. It necessarily follows that, if the right exists in the case of telegraph companies to occupy the streets, subject only to reasonable regulation under the police power, the same right exists in the case of telephone companies, for they, by the express provision of the statute of Kansas, possess all the rights and powers of telegraph companies.

There is clearly a verbal conflict between these statutes. It is easy to build up a purely verbal argument which would justify the construction that the former statute was repealed by the latter, but, if we look at the general purpose of the two statutes as the courts of the several states have viewed similar enactments, all real conflict disappears. The construction which reserves to the local authorities the police power over the subject is most consistent with the business to be regulated. Local telephone exchanges are coming to be, in relation to the general telephone business, quite similar to local telegraph offices with respect

to the general telegraph system. The long-distance telephone is becoming national in its scope. We feel justified in holding that the Legislature of Kansas did not intend to vest in any municipality power to destroy a general system of telephone exchanges extending not only over the entire state, but over several states. The state as a whole is interested in the subject, as well as the city.

Furthermore, the extraordinary power which the mayor and council of the city of Wichita are seeking to exercise is such as can only be sustained when resting upon unquestioned right. The local telephone exchange of the Kansas & Missouri Telephone Company has existed in that city for nearly twenty years. It has been built up gradually. It represents an investment of many thousands of dollars. The municipal authorities claim the power to destroy this large property. Their contemplated action can have no other result. A telephone exchange is not movable property. To remove it is to destroy it. The city makes no complaint that the telephone corporation has not promptly and faithfully complied with all municipal regulations. It claims the right not to regulate, but to expel. It is our conclusion that it does not possess that power. It is possible that such a situation might exist in a city as to justify the refusal to admit a telephone company to the streets and alleys thereof. If the city was already adequately served, and the establishment of a new system would greatly incumber the streets, it might be that in the exercise of the police power a city could properly exclude a company entirely from entering upon its streets or alleys. But no such situation is presented in this case. The city has allowed this corporation to enter upon its streets and alleys and build up this vast property. There is no contention that the primary use of the streets of the city has been seriously impaired. The whole conflict has risen not as the result of a dispute about proper regulation, but as to other and entirely foreign matters; such as the requirement that the company pay 5 per cent. of its gross receipts to the city as a license tax, and that it furnish telephones to patrons at a price to be fixed by the council.

The decree in this case is general in its language. Some of its provisions might possibly be construed as dealing with the police power of the city. No such question, however, was before the trial court. The decree must be construed as speaking only to the issues which were upon trial. If any controversy shall hereafter arise between the telephone company and the city in respect of the exercise of any police power on the part of the latter, such controversy should not be dealt with under the decree in this case, but should be considered in an independent suit.

As thus explained, the decree is affirmed.

VAN DEVANTER, Circuit Judge (dissenting). I do not concur in the full affirmance of the decree below, or in the portions of the opinion which rest complainants' right to relief upon Ordinance 391 and the act of 1868. Ordinance 391, adopted November 8, 1886, granted to the United Telephone Company and its assigns a right to erect and maintain its poles and wires along and over the streets and alleys of the

city for a period of twenty years, in consideration for which, and in lieu of any special license tax, the company and its assigns were during that period to provide an electric fire-alarm system and stated telephone service for the city at a small annual rental. This franchise was conveyed by the United Telephone Company to the Missouri & Kansas Telephone Company, a Missouri corporation, February 25, 1887, and was conveyed by the latter to a Kansas corporation of the same name June 1, 1887, in consideration of the issuance to the Missouri Company of $249,500 of the $250,000 of the Kansas Company's capital stock, of which the Missouri Company is still the owner. Immediately thereafter, and as part of the same transaction, the Kansas Company leased this franchise to the Missouri Company for the term of 99 years at an annual rental of $1, and with a stipulation that the nonpayment of the rental should not terminate or avoid the lease or lessen the rights of the lessee. This lease was virtually an absolute conveyance because it irrevocably transferred to the lessee the full beneficial use and the entire control of the franchise for its full term of existence. Ordinance 538, adopted May 16, 1888, granted to the Missouri Company and its assigns a like franchise for a period of five years, and until terminated by the city, but not exceeding twenty years. This franchise was terminated after the expiration of the five-year period, and Ordinance 1,356, adopted May 23, 1896, granted another like franchise to the Missouri Company for a similar term. The telephone system put in operation by the United Telephone Company under Ordinance 391 was included in the conveyances and lease before named along with the franchise granted by that ordinance, and was being operated by the Missouri Company when the later ordinances were adopted. If it was intended to effect an entire readjustment of the rights and obligations of the Missouri Company and the city respecting the maintenance and operation of the existing telephone system, and to make the later ordinances, each in turn, the full measure and the sole evidence of these rights and obligations, the terms of these ordinances were well chosen; but if it was intended to permit the existing franchise to continue for the original period of twenty years, with modifications in other respects, the terms employed were altogether inappropriate. Every provision of Ordinance 391 was covered in some form by both Ordinance 538 and Ordinance 1,356, and in several respects—including those relating to the term of the franchise and to the fire-alarm and telephone service for the city—each of the later ordinances was inconsistent with the first if they related to the same telephone system; and it is conceded that they did. Each of the later ordinances in terms repealed all ordinances conflicting therewith, and declared that it should take effect only on its acceptance in writing by the Missouri Company, and each was so accepted. The company did not need an additional and independent franchise of the same character while that granted by Ordinance 391 was in force. Without any doubt the purpose of each of the later ordinances was to substitute in place of the pre-existing franchise another, deemed to be better adapted to the situation, and not to grant an additional and independent one. In their subsequent conduct the parties so interpreted these ordinances. No attempt was made to put

in operation another telephone system under either of the later ordinances; nor was there a claim of a right to do so. Before the acceptance of Ordinance 538 the company and the city conformed to the provisions of Ordinance 391, including those relating to the fire-alarm and telephone service for the city, and thereafter they conformed to the provisions of Ordinance 538 while it continued in force, and then to those of Ordinance 1,356. The franchise granted by the first ordinance, having become the property of the Missouri Company, could not be recalled or terminated without its consent. In consequence Ordinance 538, as also Ordinance 1,356, provided that it should take effect only upon its acceptance in writing by the company, and this acceptance was given. Ordinances like these become contracts upon their acceptance, and, like other contracts, are to be read and interpreted in the light of the circumstances which surround their adoption. When Ordinances 538 and 1,356 are so read and interpreted, the purpose to abrogate Ordinance 391 is plain. It was competent for the city and the Missouri Company to do this, because the Kansas Company, by its unusual lease, had stripped itself of all right and interest in the original franchise; and, in any event, the acceptance of the later ordinances bound the Missouri Company, and is binding upon the complainants, whose rights are wholly derived through the Missouri Company, and originated more than eleven years after the acceptance of Ordinance 538 and almost four years after the acceptance of Ordinance 1,356. Complainants' rights can mount no higher than their source. For these reasons Ordinance 1,356 is the only subsisting one upon which the relief sought can be rested.

The act of 1868 declares that telegraph companies shall be authorized to place their poles and wires along and upon the "public roads, streets and waters" of the state "in such manner as not to incommode the public" in their use, and the act of 1885 extends to telephone companies the "rights and powers" of telegraph companies. These acts are expressed in general terms, and are operative throughout the state, except as restrained by some other statute. Before the passage of the act of 1885, before the adoption of any of the ordinances relied upon, before the incorporation of the Kansas Company, and before the acquisition of any right here asserted, the rights and powers of telegraph and telephone companies in cities of the first class had been restricted by the act of 1881. It put cities having a population of over 15,000 in a separate class, designated "cities of the first class," and made new and complete provision for their government. Among other powers conferred upon the mayor and council were these:

"Twentieth: To * * * provide for and regulate the construction and passage of railways and street railroads through the streets, avenues, alleys or lanes, and public grounds of the city: provided, that no person or company to whom the right and privilege shall at any time be granted, by the mayor and council of such city, to construct railroads and street railroads through the city, shall have the exclusive privilege to use any streets for that purpose."

"Twenty-second: To grant the right of way for the erection of telegraph or telephone posts and wires along and upon any of the streets, alleys or ways of the city, and change, modify and regulate the same.

"Twenty-third: To grant to any person or corporation the use of streets, alleys and public grounds for the purpose of laying gas, water and steam

pipes, to be used in furnishing or supplying such city and its inhabitants or any person or corporation with gas, water, steam or hot air: * * * provided, that no franchise, rights of way, or privileges of any character whatever, shall be granted by the mayor and council for a longer period than twenty years."

Elsewhere this act clothes the mayor and council with large authority over the streets, alleys, and ways of the city, and expressly provides for the regulation of all manner of use and obstruction of them. The care with which the act covers every feature of municipal authority and administration, the specific repeal of the prior laws for the government of cities coming within the new classification, and the general repeal of all acts in conflict with this one, show that it was intended to establish for these cities a municipal code complete in itself, and entirely superseding prior laws upon the subject. It is declared that the city ordinances must not be repugnant to the laws of the state, but these laws cannot be ascertained without taking into consideration the act of 1881, which was directed to a particular enumeration of the powers of a city of this class and of the subjects committed to the discretion and control of its mayor and council. The question presented is this: Is the law of the state respecting the right of a telephone company to erect and maintain poles and wires along and upon the streets and alleys of cities of the first class expressed in the act of 1868 or in that of 1881? Stated differently, the question is: Does the later act, where no right was then vested, restrain the operation of the earlier one in cities of this class, or except them from its operation, and make a grant of a right of way by the mayor and council a prerequisite to any right in a telephone company to thus occupy the streets and alleys? The question should be answered in the affirmative. We are not concerned with the wisdom of the legislation. It was open to the state to pursue its own policy. It could itself grant the right of way and control its exercise; it could grant the right of way, and delegate to the municipality the control of its exercise; or it could commit the entire subject to the municipal authorities. Many examples of each course are found in the legislation of the several states. It was not necessary that all towns and cities should be clothed with the same measure of authority and self-government. That it was not deemed wise to do so is shown by the division of municipalities into different classes, by the enactment of separate laws for each class, and by the omission from the laws enacted for the government of other cities and towns of any provision expressly empowering them to grant the right to occupy their streets and alleys for telegraph or telephone purposes. It was within the power and discretion of the state to place cities, the needs and permanent character of which were indicated by a population of more than 15,000—those of the first class—upon a different footing from others in respect of this use of their streets and alleys. This is what was done by the act of 1881. That the Legislature so understood is indicated by an act of 1891, wherein, after providing, inter alia, for the acquisition of rights of way over private property by telegraph corporations, it was declared: "And such * * * wires may be * * * carried or stretched * * * through any street or alley

or public ground of any city of the second or third class." Sess. Laws Kan. 1891, p. 149, c. 85; Gen. St. 1901, § 1366. Cities of the first class—those to which the act of 1881 had committed the entire subject of telegraph and telephone rights of way—were carefully omitted from this direct exertion of the state's authority over municipal highways. The three classes of cities covered by the acts of 1881 and 1891 embrace all organized cities, towns, and villages; the first class including those of over 15,000 inhabitants, the second those of over 2,000 and not exceeding 15,000, and the third those of not more than 2,000. Gen. St. 1889, §§ 545, 756, 922. The legislative understanding of the effect of the act of 1881 is further indicated by a recent act relating to cities of the first class, which confers upon the mayor and council power "to prescribe and fix maximum rates and charges, and regulate the collection of the same, for all * * * telephone service * * * furnished to such city or to any of the inhabitants thereof by any person or corporation now authorized by such city by virtue of a franchise ordinance, or that may hereafter be authorized by virtue of a franchise ordinance, to furnish * * * telephone service * * * to such city or to its inhabitants." Sess. Laws Kan. 1903, p. 186, c. 122, § 51.

The policy of the state toward its municipal corporations has generally been marked by a liberal bestowal of power upon them. As was observed in Converse v. City of Ft. Scott, 92 U. S. 503, 505, 23 L. Ed. 621: "The general legislation of Kansas confers unusual power upon municipal corporations in that state. * * * It enlarges the range of municipal authority and duty far beyond the limits within which such corporations are commonly understood to be confined." This is also true of the legislation in respect of their streets and alleys. An act authorizing water companies to acquire rights of way for their canals by condemnation proceedings provides "that no such canal shall be located through any street or alley or any public grounds of any city without the consent of the municipal authorities." Sess. Laws Kan. 1876, p. 153, c. 58; Gen. St. 1901, § 1366. Another act, in force since 1868, provides that a railroad cannot be constructed in, upon, or across any street of an incorporated city or town without the assent of its corporate authorities. Gen. St. Kan. 1868, p. 202, § 47; Gen. St. 1901, § 1316. This law was considered in Pacific Railroad Co. v. Leavenworth, 1 Dill. 393, Fed. Cas. No. 10,649, where it was said by Judge Dillon:

"It has been argued in behalf of the complainant that this statute simply clothes the city with the power to say 'yea' or 'nay,' but that it does not authorize it to stipulate for terms or conditions. But in this view I cannot concur. Its power is complete; and it was undoubtedly the design of the Legislature that the city authorities, as the representatives and guardians of the public interests of the city and its inhabitants, should have the power to prescribe, as conditions of giving their assent, such lawful and proper terms as they deemed expedient."

The act of 1868 is general in its terms, makes no mention of the authority of cities in respect of telegraph or telephone rights of way, and embraces the streets and alleys of cities only as they are part of the public roads and streets of the state. The act of 1881 is specific in its terms, and is directed particularly to the authority of cities of the first

class in respect of such rights of way. If it was intended that the right to occupy the streets and alleys of these cities with telegraph or telephone lines should continue to arise from the earlier act, there was manifest impropriety in the provision which was inserted in the later act; and, if that clear and concise provision was intended to clothe cities of the first class with power to grant such rights of way, necessarily implying the power of refusal, no right to so occupy the streets and alleys of these cities could thereafter arise from the earlier act. The inconsistency is more than verbal. It is of that character which occurs when separate acts lodge the same authority in different places, when, in its nature, it can exist and be exercised in but one. This inconsistency is disposed of by the application of the familiar rule for interpreting conflicting statutes, that one which is directed to a particular matter controls in respect thereof over one which is general in its terms, although in its general terms the particular matter may be included. Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 558, 24 Sup. Ct. 538, 48 L. Ed. 788. The act of 1868 did not bring telegraph rights of way in cities to the attention of the Legislature, except in the most general way; but the terms of the act of 1881 are such that rights of way for telegraph and telephone lines in cities of the first class is a matter to which particular attention was necessarily directed. The increase in the number of cities of the state and in their population during the intervening years had also given increased importance to the subject. The special enactment, which also has the added force of being a later expression of the legislative will, controls the general one. The first means of ascertaining the meaning of a statute is to consult its words. The act of 1881 declares: "The mayor and council * * * shall have power: * * * Twenty-second: To grant the right of way for the erection of telegraph or telephone posts and wires along and upon any of the streets, alleys or ways of the city and change, modify and regulate the same." These words are not reasonably susceptible of an interpretation which clothes the mayor and council with power to merely regulate the use of the right of way. They plainly confer the power to grant the franchise, as well as the power to regulate its use. There is nothing unreasonable in this; nothing which suggests that the words could not have been used in their natural or usual sense. The context does not restrict their natural or usual meaning, but shows they were used with that meaning. Subdivisions 20 and 23, before quoted, authorize the granting of similar rights of way, not the mere regulation of their use. The three subdivisions, considered together, unmistakably disclose a purpose to invest the mayor and council with authority to grant rights of way along, upon, and across the streets and alleys for railroads, street railroads, telegraph, and telephone lines, and gas, water, and steam pipes, subject only to two restrictions—one, that rights of way for railroads and street railroads shall not be exclusive; and the other that no franchise, right of way, or privilege shall be for a longer period than twenty years. The express imposition of these restrictions implies that none other was intended. The conclusion that subdivision 22 empowers the mayor and council to both grant and regulate the right to occupy the streets and alleys of the city with telegraph and tele-

phone poles and wires is enforced by the plain import of its words, by the bestowal of similar power in contiguous subdivisions, by the subsequent legislative interpretation, and by the policy of the state to confer extensive authority upon its municipal corporations in respect of their streets and alleys. Certainly the construction of railroads into and through cities and towns is not less a matter of general interest or more a matter of local concern than is the construction of telegraph and telephone lines, and yet, as has been shown, the power to authorize as well as to regulate the construction and operation of railroads in, upon, and across the streets of an incorporated city or town has long been lodged in the municipal authorities by the laws of the state. If the act of 1881 had expressly added an excepting clause to the law of 1868 to the effect that the right of way for telegraph and telephone lines in cities of the first class must be obtained from the mayor and council, the purpose to commit the entire subject to the municipal authorities would not have been more clearly shown. Such legislation confers the power to say whether or not, and upon what terms or conditions, the right to so use or occupy the municipal highways shall exist. State v. Spokane (Wash.) 63 Pac. 1116; Southern Bell Telephone Co. v. Richmond, 44 C. C. A. 147, 153, 103 Fed. 31, 36; Duluth v. Duluth Telephone Co., 84 Minn. 486, 491, 87 N. W. 1127, 1129; Pacific Railroad Co. v. Leavenworth, 1 Dill. 393, 399, Fed. Cas. No. 10,649; Northern Central Ry. Co. v. Baltimore, 21 Md. 93, 104.

Cases from Minnesota, Wisconsin, and Michigan are cited in support of the view that the provision in the act of 1881 confers a mere power of making needful police regulations. These cases are distinguishable from the one now under consideration. Northwestern Telephone Exchange Co. v. Minneapolis, 81 Minn, 140, 158, 161, 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175, Duluth v. Duluth Telephone Co., 84 Minn. 486, 491, 87 N. W. 1127, and Abbott v. Duluth (C. C.) 104 Fed. 833, 838, hold that an act passed in 1893, providing, in substance, that the franchise to occupy the streets and alleys of a city with telephone poles and wires must be obtained from the city, did not affect vested rights acquired under a law similar to the Kansas act of 1868, but they fully recognize that after the passage of the new act the franchise could be obtained only from the city. The first of these cases also holds that an amendment to the city charter (quoted in the majority opinion) passed after the telephone company's franchise was acquired should be harmonized with the prior law so as to avoid an interference with the company's vested rights. The Wisconsin and Michigan cases hold that the words "to prohibit," used in connection with other terms unmistakably disclosing a purpose to merely authorize needful police regulations respecting the use of streets and alleys for telegraph and telephone poles and wires, do not authorize the entire removal or exclusion from the city of all poles and wires, but have reference to such as shall be erected or maintained in a manner violative of these regulations. Neither of these states had, prior to the vesting of the rights in controversy, empowered cities or towns to grant rights of way for telegraph and telephone lines as well as to exercise the usual police control over them.

Reference is made to the congressional act of July 24, 1866 (14 Stat. p. 221, c. 230), authorizing telegraph companies, upon filing written acceptance of its provisions with the Postmaster General, to construct, maintain, and operate lines of telegraph over and along any of the post roads of the United States in such manner as not to interfere with ordinary travel (14 Stat. 221; Rev. St. § 5263); but that act has no bearing upon this controversy. It is not applicable to telephone companies. Richmond v. Southern Bell Telephone Co., 174 U. S. 761, 19 Sup. Ct. 778, 43 L. Ed. 1162. And, if the streets of cities to which the system for the free delivery of mail is extended become post roads, still public documents, of which we may take judicial notice, inform us that this system was first extended to Kansas in 1874, and included but two cities of that state in 1881—Leavenworth and Topeka. Reports Postmaster-General 1874, pp. 20, 266; 1880, p. 17; 1881, p. 82. The right of telegraph companies accepting the congressional act is not more independent of the consent of municipal authorities than it is independent of the consent of the state. It arises wholly from the exertion of the power of Congress over the postal service and interstate and foreign commerce, and, instead of requiring the support of state legislation, arises independently of it. We are only concerned with ascertaining the effect of the statutes of the state upon a subject within its legislative control, and that subject is the right to place telegraph lines not within the protection of the congressional act, and telephone lines, in municipal highways. It is no more affected by congressional legislation than is a subject within the control of Congress affected by state laws.

Complainants derive no right from the act of 1868. Its operation is restrained in cities of the first class, like Wichita, by the act of 1881, which empowers the mayor and council to grant as well as to regulate the right to place telephone poles and wires in their streets and alleys.

The decree should be modified so as to protect complainants' rights under Ordinance 1,356 during the continuance of the franchise thereby granted.